UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROMELL HANDLEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 12 C 5032 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Romell Handley ("Petitioner") is serving a 20-year sentence for his participation in a racketeering conspiracy. He filed a petition to vacate his sentence under 28 U.S.C. § 2255 ("the Petition") alleging ineffective assistance of counsel. (R. 1, Pet.) For the reasons set forth below, the Petition is denied.

## BACKGROUND

### I.      Petitioner's Conviction

The facts underlying Petitioner's conviction are set forth in detail in prior opinions of the U.S. Court of Appeals for the Seventh Circuit and this Court. *See United States v. Morales*, 655 F.3d 608 (7th Cir. 2011); *United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011); *United States v. Benabe*, 436 Fed. App'x 639 (7th Cir. 2011) (per curiam); *United States v. Delatorre*, 572 F. Supp. 2d 967 (N.D. Ill. 2008); *United States v. Delatorre*, 522 F. Supp. 2d 1034 (N.D. Ill. 2007); *United States v. Delatorre*, 508 F. Supp. 2d 648 (N.D. Ill. 2007); *United States v. Delatorre*, 438 F. Supp. 2d 892 (N.D. Ill. 2006). They are repeated here only generally.

In 2002, state and federal authorities began an intensive investigation into the Insane Deuces street gang after one of its members, Orlando Rivera, agreed to serve as a confidential informant. *Morales*, 655 F.3d at 615, 617. Petitioner was among 16 men indicted on various racketeering-related charges in connection with the investigation. *Id.* at 615. The evidence adduced at trial showed that the Insane Deuces was an organized street gang affiliated with the Folks, a national network of local gangs. *Id.* The government's investigation focused on the Aurora Deuces, a chapter of the Insane Deuces with a significant presence in Aurora, Illinois. *Id.* As of 2002, the Aurora Deuces had become bitter rivals of the Latin Kings (also referred to as the "Kings"). *Id.* at 616. This rivalry led to "frequent and escalating violence," which often resulted in injury to innocent persons who were mistakenly believed to be rival gang members. *Id.*

The Insane Deuces had its own set of "leyas," or laws, as well as a detailed hierarchy. *Id.* There were three tiers of membership within the gang: Seniors, Juniors, and Shorties. *Id.* Shorties were the gang's youngest members, and they held the responsibility of carrying out most of the gang's activities, including shootings and other acts of violence, as well as selling drugs to fund the gang. *Id.* Shorties were often juveniles who were recruited to increase the gang's ranks. *Id.* By participating in gang activities, Shorties could work their way up to becoming Juniors, who were responsible for the gang's day-to-day operations. *Id.* Juniors directed Shorties in their activities, including determining who would participate in particular acts of violence and providing them with firearms. *Id.* Seniors were "longstanding members of the gang whose age and accomplishments made them the leaders, broad-scope planners, and advisors for the gang." *Id.* Seniors directed Juniors on larger issues, but they were more removed from the gang's day-to-day activities. *Id.* Juniors were the leaders of the gang, and they directed the gang's day-to-day

activities, which included selling drugs, carrying out "missions" (attacks on rival gang members), protecting and supporting fellow gang members and their families, and punishing gang members who violated the gang's rules. *Id.*

Working with law enforcement, Rivera reported on the gang's activities, conducted controlled buys of narcotics and firearms from gang members, and surreptitiously recorded several meetings and conversations between gang members. *Id.* The intelligence gathered through Rivera produced evidence regarding "four murders, eleven attempted murders, two solicitations to commit murder, other shootings, and narcotics distribution incidents—all of which the Deuces perpetrated in 2002 alone." *Id.* From information obtained through Rivera, government authorities learned about various members' roles in the gang. *Id.* The Seventh Circuit summarized Petitioner's involvement in the gang as follows:

> Handley declared to an Aurora police officer that he'd been "a King killer and a Deuce all [his] life." According to Rivera's testimony, Handley was the Shorty Enforcer in Aurora at the time of the events in this case, assigning missions to Shorties and storing firearms for the missions at his home. He was involved in at least three of the gang's attempted murders (either driving stolen cars during the missions or personally firing on rivals). At some point, however, Handley lagged in his participation, and the gang's leadership ordered other members to beat Handley if they found him during the summer of 2002.

*Id.* at 618.

Following an extensive investigation, a federal grand jury returned a multi-count indictment against Petitioner and 15 other gang members. *Id.* One of the 16 men pled guilty, and another remained a fugitive. *Id.* The Court divided the remaining 14 defendants into two groups for purposes of trial. *Id.* at 619. Petitioner was grouped with the "less major players," which were to be tried before U.S. District Judge Harry D. Leinenweber. *Id.*

3

In April 2008, Judge Leinenweber commenced the trial of the less major players. *United States v. Morales*, No. 03 CR 90, 2009 WL 1456567, at *1 (N.D. Ill. May 22, 2009). However, a mistrial was declared shortly after opening statements when several jurors asked to be removed from the jury. *Id.* The retrial was scheduled for October 2008. *Id.* In the interim, the trial of the other group of defendants—the so-called "leaders" of the gang—proceeded before this Court, and all but one of the defendants were convicted of racketeering conspiracy and other offenses.[1] *Benabe*, 654 F.3d at 757.

In October 2008, the retrial of the less major players was held. *Morales*, 655 F.3d at 619. On the government's motion, Judge Leinenweber empaneled an anonymous jury. *Id.* The trial spanned more than two months, during which time the government presented extensive witness testimony, recordings of gang meetings, and forensic evidence establishing the gang's activities, rules, and purpose. *Id.* Rivera described the inner workings of the gang, explained what was said in the various recorded meetings, and described the gang's organization and means of rule enforcement. *Id.* Two other former gang members, Lorenzo Becerra and Akeem Horton, testified in cooperation with the government regarding the gang's activities and the scope of participation of each individual defendant. *Id.* The government also presented testimony from a variety of police officers and federal agents, as well as several victims of the violence perpetrated by the gang. *Id.* After a week of deliberations, the jury returned its verdicts finding Petitioner and all but one other defendant guilty of racketeering conspiracy.[2] *Id.* Several defendants were sentenced to

---

[1] The jury could not reach a verdict as to defendant Harold Crowder. *Benabe*, 654 F.3d at 757 n.1. He was retried with the second group and convicted. *Id.*; *Morales*, 655 F.3d at 615.

[2] The jury could not reach a verdict as to defendant Steven Perez. *Morales*, 2009 WL 1456567, at *1. He was retried on his own before this Court and convicted. *United States v. Perez*, 673 F.3d 667, 668 (7th Cir. 2012).

4

life in prison; Petitioner and others were sentenced to 20 years. *Id.* at 620; *Benabe*, 654 F.3d at 757.

On appeal, the defendants raised a variety of joint and individual arguments in what the Seventh Circuit described as a "virtual cannonade of briefing." *Morales*, 655 F.3d at 620. Jointly, the defendants argued that the Court erred in empaneling an anonymous jury, erred in denying their motions for severance, and erred in handling an allegation of juror misconduct that arose during the trial. *Id.* at 620-33. Petitioner separately challenged his sentence, arguing that Judge Leinenweber erred in holding him accountable for violent acts committed by other gang members. *Id.* at 644-47. In a lengthy published opinion, the Seventh Circuit rejected each of these arguments and affirmed Petitioner's conviction and sentence in all respects. *Id.* at 620-47.

## II.    Section 2255 Petition

In June 2012, Petitioner filed the present Petition. (R. 1, Pet.) He claims that his trial attorney, Beau Brindley, provided ineffective assistance in connection with a plea agreement offered by the government prior to trial. (*Id.* at 3; R. 3, Pet'r's Mem. at 4-7.) The proposed plea agreement would have required Petitioner to plead guilty to one count of possessing a firearm in violation of 18 U.S.C. § 924(c) and one count of conspiring to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5). (R. 4, Pet'r's Aff., Ex. A, Plea Offer ¶ 5.) The proposed agreement further provided that Petitioner would serve an agreed sentence of 15 years in prison. (*Id.* ¶ 10.) Petitioner claims that Brindley erroneously advised him that the statutory maximum penalty he faced if convicted on the racketeering charge was 10 years, whereas the actual statutory maximum was 20 years. (R. 4, Pet'r's Aff. ¶¶ 6-9.) Petitioner contends that based on Brindley's inaccurate advice, he rejected the government's plea offer and proceeded to trial. (*Id.* ¶ 10.) He claims that had he known he was facing a 20-year sentence, he

would have accepted the plea offer. (*Id.* ¶ 12.) This Court granted Petitioner's request for an evidentiary hearing and also appointed counsel to represent him in this case.[3] (R. 21, Order.)

On April 15, 2015, the Court conducted an evidentiary hearing on the Petition, taking testimony from Petitioner and former Assistant U.S. Attorney Patrick Pope.[4] (R. 34, Min. Entry; R. 36, Evidentiary Hr'g Tr.) Following the evidentiary hearing, the parties submitted post-hearing briefs. (*See* R. 38, Pet'r's Post-Hr'g Br.; R. 40, Gov't's Post-Hr'g Br.; R. 41, Pet'r's Reply.)

According to the evidence presented, Petitioner was arrested in the underlying criminal case in September 2005. (R. 33, Stip. Facts ¶¶ 1-3.) After he was taken into custody, he waived his *Miranda* rights and gave a detailed statement to law enforcement describing his long-time involvement in the gang. (R. 32, Joint Ex. 7, ATF Report at 540-47.) He admitted becoming a member of the Insane Deuces as a teenager, and although he claimed to have fallen away from the gang to some extent since 2003, he admitted that he was still a gang member, that he had attended many gang meetings, and that for a time he had been a leader of the Shorties. (*Id.*) He

---

[3] The Court expresses its gratitude to attorney Heather Winslow, who graciously served as appointed counsel for Petitioner in this case.

[4] Due to some unusual extenuating circumstances, Brindley did not testify or otherwise participate in this case. When the Petition was first filed, Pope had several discussions with Brindley in which Brindley reportedly disputed Petitioner's version of events. (R. 19, Gov't's Resp. to Ct.'s Order at 2.) Brindley's account—according to Pope—was that Brindley advised Petitioner on several occasions prior to trial that he was facing a 20-year statutory maximum penalty if convicted on the racketeering charge. (*Id.* at 3.) Brindley told Pope that Petitioner refused to accept the 15-year plea offer because he wanted a sentence of 12 years, which the government was not willing to offer. (*Id.* at 4.) In July 2014, Pope was in the process of finalizing an affidavit containing this information for Brindley's signature when Brindley was informed by the U.S. Attorney's Office in Milwaukee that he was the target of a criminal investigation being conducted by that office. (*Id.* at 2-3.) Brindley later advised Pope that he would not be signing an affidavit in this case on the advice of his own legal counsel. (*Id.*; *see also* R. 36, Evidentiary Hr'g Tr. at 103.) Brindley was later indicted on charges of witness tampering and related offenses, but was ultimately acquitted of those charges. *See United States v. Brindley*, No. 14 CR 468 (N.D. Ill. order dated Aug. 31, 2015).

admitted to committing certain acts on behalf of the gang, including stealing a car to be used for a drive-by shooting. (*Id.*) He also gave agents information about various other gang members, as well as details of the gang's structure and operation. (*Id.*) At the end of the interview, he asked "what he was going to get for his cooperation." (*Id.* at 545.) He was told that no promises could be made to him at that time. (*Id.*) He then stated that he wanted to cooperate but "felt he needed to speak with a lawyer." (*Id.*) At that point the interview was terminated. (*Id.*)

On October 11, 2005, a detention hearing was held, and Petitioner was ordered detained pending trial. (R. 33, Stip. Facts ¶ 4.) In May 2006, the grand jury returned a second superseding indictment charging sixteen defendants with various offenses. (*Id.* ¶ 6.) Petitioner was charged solely under Count I, the racketeering conspiracy count. (*Id.*) Between the date of his arrest and 2007, Petitioner was represented by a succession of attorneys: John Meyer, Charles Aron, and James Shapiro. (*Id.* ¶¶ 3-12.) Petitioner testified that he had intended to plead guilty since the date of his arrest, but admitted that he never asked Meyer, Aron, or Shapiro to try to negotiate a plea agreement on his behalf. (R. 36, Evidentiary Hr'g Tr. at 14-15, 62-63.)

Following the withdrawal of Shapiro in September 2007, the Court appointed Brindley to represent Petitioner. (R. 33, Stip. Facts ¶ 12.) According to Petitioner, Brindley told him at their first meeting: "[W]e're not negotiating, we're not pleading and we're not cooperating. We're going to trial." (R. 36, Evidentiary Hr'g Tr. at 17.) Notwithstanding Brindley's statement, Petitioner felt that he could have asked Brindley for a plea agreement if he wanted to, but he acknowledged that he did not do so at that time. (*Id.*) Eventually, Petitioner did make several requests of Brindley to try to obtain a plea agreement. (*Id.* at 18.) Petitioner testified that Brindley told him that a plea would not be in his best interests because "the government would probably offer me more than I would possibly get if I were to go to trial." (*Id.*)

7

However, Brindley did engage in plea negotiations with the government. (*Id.* at 73.) Pope testified that he engaged in multiple plea discussions with Brindley between late October and mid-November 2007. (*Id.* at 73, 76.) Prior to beginning those discussions, Pope calculated the advisory sentencing guidelines range for Petitioner based upon the allegations in the indictment. (*Id.* at 74.) Because the racketeering conspiracy offense involved four murders, several attempted murders, and other violent acts, Pope calculated an offense level of 43, which is "as high as you can go." (*Id.* at 74, 78.) Offense level 43 carries a corresponding sentencing range of life imprisonment, regardless of a defendant's criminal history category. (*Id.* at 75.) However, because the racketeering conspiracy charge carried a statutory maximum sentence of 20, that was the maximum sentence that could be imposed. (*Id.*) Even though the statutory maximum was capped at 20 years, the government's calculation of life was still relevant in Pope's view. (*Id.*) The calculation would dictate what type of plea the government was willing to agree to, and it would also likely impact the Court at sentencing in terms of deciding whether a sentence at or near the statutory maximum was appropriate. (*Id.* at 78.)

The 20-year statutory maximum was the "main subject of discussion" between Pope and Brindley during plea negotiations. (*Id.* at 75.) Pope testified that "the entire purpose" of the plea negotiations was to try to "reach a plea agreement that would be less than the statutory maximum of 20 years." (*Id.* at 77.) In November 2007, after multiple discussions with Brindley, Pope prepared a draft plea agreement for Petitioner which contemplated an agreed sentence of 15 years. (*Id.* at 77-81.) The proposed agreement also contemplated that Petitioner would plead guilty to a superseding information charging him with two different offenses: (a) conspiracy to commit murder in violation of 18 U.S.C. § 1959, which carried a statutory maximum sentence of 10 years; and (b) possession of a firearm in furtherance of a violent crime in violation of 18

U.S.C. § 924(c), which carried a statutory minimum sentence of five years and a maximum sentence of life. (*Id.* at 80.) Combining the 10-year maximum on the Section 1959 charge and the five-year minimum on the Section 924(c) charge resulted in an agreed sentence of 15 years. (*Id.*) As a factual basis for the plea, the agreement described Petitioner's role as a leader of the Shorties, as well as describing two separate incidents wherein Petitioner loaned guns to other gang members to use in shootings. (R. 32, Joint Ex. 3, Draft Plea Agreement ¶ 6(c).) Pope and Brindley devised this unusual arrangement because, according to Pope, the government could not agree to a sentence of 15 years on the racketeering conspiracy charge and "stay faithful to the guidelines." (R. 36, Evidentiary Hr'g Tr. at 80-81.)

On November 14, 2007, Pope sent the proposed plea agreement to Brindley for him to review with Petitioner. (*Id.* at 87; R. 32, Joint Ex. 2, Letter of Nov. 14, 2007.) Pope's transmittal letter stated that the plea agreement was subject to a "full, complete, and truthful proffer" by Petitioner. (R. 32, Joint Ex. 2, Letter of Nov. 14, 2007.) According to Pope, this condition was critical from the government's perspective; Pope wanted to avoid a situation wherein Petitioner would plead guilty and then take the stand on behalf of his co-defendants claiming responsibility for murders or other violent acts, knowing that his sentence was capped at 15 years. (R. 36, Evidentiary Hr'g Tr. at 89-90.)

According to Petitioner, Brindley brought the government's written plea proposal to him at the Metropolitan Correction Center ("MCC"), where he was being detained. (*Id.* at 19-20.) Brindley explained to him that the plea agreement provided for a sentence of 15 years. (*Id.* at 20.) Petitioner claimed that Brindley told him that if he was convicted on the racketeering charge, he was facing a likely sentence of 70 to 87 months' imprisonment, with a maximum sentence of 10 years. (*Id.* at 21.) Petitioner claimed that Brindley told him, "I'm only bringing

this [plea] to you because you asked me several times to bring it to you," but that it would be in his best interests to reject the plea. (*Id.* at 22.) According to Petitioner, Brindley told him that if he accepted the plea, he would "be pleading out to more than what I could possibly get if I went to trial and got found guilty." (*Id.* at 23.)

When he saw the proposed plea, Petitioner had concerns about pleading guilty to charges that were not contained in the original indictment. (*Id.* at 22.) However, he did not make a decision about the plea during that initial meeting. (*Id.*) Rather, he took the plea with him and continued to consider it. (*Id.* at 23.) According to Petitioner, he ultimately rejected the plea because Brindley told him it would be in his best interests to go to trial. (*Id.* at 24.) He claimed that he did not know until years later, when he was doing legal research at a federal penitentiary, that the racketeering charge carried a statutory maximum sentence of 20 years. (*Id.* at 30.) He testified that had Brindley accurately advised him that he was facing a potential 20-year sentence, he "definitely" would have accepted the government's plea offer. (*Id.* at 24, 31-32.)

## LEGAL STANDARD

A federal prisoner can seek to vacate his sentence on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013).

## ANALYSIS

Petitioner's sole claim is that he received ineffective assistance from Brindley in connection with the government's plea offer. (R. 1, Pet. at 4; R. 38, Pet'r's Post-Hr'g Br. at 10-

23.) Under the Sixth Amendment, a criminal defendant is entitled to "'effective assistance of counsel'—that is, representation that does not fall 'below an objective standard of reasonableness' in light of 'prevailing professional norms.'" *Bobby v. Van Hook*, 558 U.S. 4, 6 (2009) (per curiam) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To prevail on such a claim, the petitioner must show: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). In other words, counsel "need not be perfect, indeed not even very good, to be constitutionally adequate." *McAfee v. Thurmer*, 589 F.3d 353, 355-56 (7th Cir. 2009) (citation omitted); *see also Harrington*, 562 U.S. at 110 ("[T]here is no expectation that competent counsel will be a flawless strategist or tactician[.]"). In evaluating counsel's performance, the Court must avoid employing the benefit of hindsight and must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 562 U.S. 115, 125 (2011).

On the prejudice prong, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."

*Harrington*, 562 U.S. at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id*. at 112.

The Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). Claims of ineffective assistance at the plea bargain stage are governed by the *Strickland* two-part test. *Missouri v. Frye*, 132 S. Ct. 1399, 1405 (2012). On the performance prong, a petitioner must show that counsel's performance "fell below an objective standard of reasonableness." *Lafler*, 132 S. Ct. at 1384 (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). In evaluating this prong, the Court must take particular care to avoid the "distortions and imbalance that can inhere in a hindsight perspective," *Premo*, 562 U.S. at 125, because "the sentencing consequences of guilty pleas (or, for that matter, guilty verdicts) are extraordinarily difficult to predict." *United States v. Barnes*, 83 F.3d 934, 940 (7th Cir. 1996); *see also Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006) ("Because many questions about the facts and how a court or jury will apply the law to those facts cannot be answered by counsel with certitude, '[w]aiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.'" (citation omitted)). Therefore, "[a]n inaccurate prediction of a sentence alone is not enough to meet the standard." *Bethel*, 458 F.3d at 717. However, if an attorney "grossly mischaracterized" the defendant's possible sentence in connection with a plea, this will establish deficient performance. *Thompson v. United States*, 732 F.3d 826, 830 (7th Cir. 2013); *see also United States v. Martinez*, 169 F.3d 1049, 1053 (7th Cir. 1999) ("We recognize that some predictions are such gross mischaracterizations that they provide a strong indication of [constitutionally] deficient performance." (alteration in original) (internal quotation marks and citation omitted)).

To establish prejudice in the plea bargain context, a defendant must show that "the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S. Ct. at 1384. To do so, he "must demonstrate a reasonable probability [he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel." *Frye*, 132 S. Ct. at 1409. It is not enough to show that counsel gave the defendant inaccurate advice; he must show that counsel's advice was the "decisive factor" in his decision to accept or reject the plea. *Wyatt v. United States*, 574 F.3d 455, 458 (7th Cir. 2009). A defendant's "self-serving" testimony that he would have made a different decision with different advice need not be accepted at face value. *Foster v. United States*, 735 F.3d 561, 566-67 (7th Cir. 2013). The Court should also consider such factors as the history of plea negotiations and the likelihood that the error would have impacted the defendant's decision under the circumstances of the case. *Julian v. Bartley*, 495 F.3d 487, 499-500 (7th Cir. 2007); *Moore v. Bryant*, 348 F.3d 238, 242-43 (7th Cir. 2003).

To make the necessary showing of prejudice, the defendant must also demonstrate that he was willing to meet the other terms of a plea offer, including admitting the factual basis of the plea and acknowledging "full culpability" if those were requirements of the plea. *Thompson*, 732 F.3d at 830. He must also demonstrate a reasonable probability that the plea would have been accepted by the government and approved by the court if not for counsel's error. *Frye*, 132 S. Ct. at 1410. This showing is "of particular importance because a defendant has no right to be offered a plea nor a federal right that the judge accept it." *Id.* (internal citations omitted).

## I. Deficient Performance

Petitioner claims that Brindley erroneously advised him that he was facing a 10-year maximum sentence if he proceeded to trial, and that he rejected the government's 15-year proposed plea offer based on this erroneous advice. (R. 1, Pet. at 4; R. 36, Tr. at 24, 31-32.) Such

an error by Brindley, if it occurred, is no doubt the type of gross mischaracterization of a potential sentence that would constitute deficient performance. *See Julian*, 495 F.3d at 496-97 (counsel was deficient when he incorrectly advised the defendant in connection with a plea offer that he was facing a maximum of 30 years in prison when he was actually facing a 60-year sentence); *Moore*, 348 F.3d at 242-43 (petitioner established ineffective assistance where his attorney miscalculated his maximum sentence by 10 to 15 years). Based on the evidence, however, the Court declines to credit Petitioner's account that this is what Brindley told him.

Although Petitioner testified that Brindley misadvised him in connection with the proposed plea, several pieces of evidence undercut Petitioner's credibility. First and foremost, Petitioner admitted to having lied under oath before. At sentencing, in response to a series of questions from Judge Leinenweber, Petitioner testified under oath that he had read the pre-sentence report ("PSR") and the supplements thereto, that he was aware of their contents, and that he had discussed them with Brindley. (*United States v. Delatorre, et al.*, No. 03 CR 90, R. 1776, Sentencing Tr. at 3.) At the evidentiary hearing, he testified (again under oath) that this was false; he claimed that he did not read the PSR and was entirely unaware of its contents— including that he was facing a potential 20-year sentence—until Judge Leinenweber actually imposed his sentence. (R. 36, Evidentiary Hr'g Tr. at 55-56, 68.) Petitioner had no reasonable explanation for this discrepancy, other than to state that lying to Judge Leinenweber was what he felt he "had to do" at the time. (*Id.* at 68.) His testimony at the evidentiary hearing also conflicted with a sworn statement he made in the affidavit submitted with his Petition, wherein he stated that Brindley told him after he was convicted, but *prior* to sentencing, that he was facing a potential 20-year sentence. (R. 4, Pet'r's Aff. ¶ 11.) The Court is cognizant that several years have passed since these events occurred, but it is unlikely Petitioner would be confused about

when he first learned he was facing 20 years in prison; at the evidentiary hearing he described his anger and shock at sentencing when he allegedly learned this information for the first time, even recalling what he said to his family members when the sentence was imposed. (R. 36, Evidentiary Hr'g Tr. at 27-28, 44-45.)

Second, Petitioner has offered shifting testimony about his involvement in the gang, which in the Court's view cuts against his credibility. He was asked questions about two separate incidents outlined in the draft plea agreement wherein he gave firearms to members of the gang to shoot members of a rival gang; ultimately, he testified that he did not recall whether the incidents occurred. (*Id.* at 59-60.) He also gave equivocal answers about the length of time he served in the position of Shorty Enforcer. (*Id.* at 54-58.) This is not the first time Petitioner has tried to minimize his involvement in the gang. At sentencing, he told the probation officer that he had "never accompanied or assisted other gang members for the purpose of supporting their acts of violence." (*See* R. 36, Evidentiary Hr'g Tr. at 53.) Similarly, in his post-arrest interview with law enforcement agents, he admitted selling drugs on behalf of the gang but claimed he was "not about guns or that violent stuff." (R. 32, Joint Ex. 7, ATF Report at 542.) These statements stand in stark contrast to the evidence presented by the government at trial regarding Petitioner's long-time involvement in the gang, including his own recorded statements and those of other gang members. (*See Delatorre*, No 03 CR 90, R. 1776, Sentencing Tr. at 8-20.)

At the evidentiary hearing, Petitioner testified that he would have signed the plea agreement admitting to the facts contained within it regardless of whether they were accurate. (R. 36, Evidentiary Hr'g Tr. at 49, 58-61.) Petitioner's apparent willingness to sign a formal court document containing false information does not engender much confidence about the veracity of the documents he has submitted in this case. It appears to this Court that, regrettably, Petitioner

is willing to attest to whatever facts appear most advantageous to him at a particular time, regardless of their truth. This is perhaps understandable given the steep sentence he is serving, but these discrepancies significantly undercut the believability of Petitioner's account.[5]

Petitioner's account of what Brindley told him is also not credible when considered in context. Pope, who is no longer employed by the U.S. Attorney's Office, credibly testified that both he and Brindley fully understood that the government had calculated a preliminary guideline range for Petitioner of life in prison, and that the statutory maximum was 20 years. (R. 36, Evidentiary Hr'g Tr. at 73-85, 94-95.) Pope and Brindley had multiple discussions about a potential plea, during which time the 20-year statutory maximum was "the main subject of discussion." (*Id.* at 75.) According to Pope, Brindley was "pushing us to get him less than 20 years' imprisonment." (*Id.* at 96.) The two ultimately came up with a creative solution for affording Petitioner a plea agreement with a sentence of less than 20 years. (*Id.* at 80-82.) Specifically, a superseding indictment would be issued charging Petitioner with two entirely different offenses, which together would carry a sentence of 15 years. (*Id.* at 80; R. 32, Joint Ex. 3, Draft Plea Agreement; R. 32, Joint Ex. 8, Draft Superseding Information.)

The record thus reflects that Brindley spent a significant amount of time and effort working to obtain the 15-year plea deal. The Court finds it illogical that a seasoned defense attorney would have wasted his time in this manner in the midst of extensive trial preparations, if he in fact believed that his client was facing a 10-year statutory maximum sentence. It also defies logic that Brindley would have had multiple discussions with Pope aimed at getting Petitioner

---

[5] At the evidentiary hearing, Petitioner described the difficulties he has had maintaining regular contact with his five children while in prison. (R. 36, Evidentiary Hr'g Tr. at 63-64.) He further testified that he would be "overwhelmed" if he could obtain any type of reduction in his sentence. (*Id.* at 64.) The Court is sympathetic to Petitioner's personal situation, but his strong desire to obtain a reduction in his sentence must be considered in weighing his overall credibility.

out from under the 20-year maximum sentence, only to turn around and tell Petitioner that he was facing a maximum sentence of 10 years in prison.

Petitioner submits letters he received from Brindley in support of his claim, but they do little to bolster his account. The first letter was written by Brindley in December 2008, *after* Petitioner had already been convicted. (R. 32, Joint Ex. 4, Letter of Dec. 14, 2008.) The letter mentions the possibility of Petitioner obtaining a sentence in the 70-87 month range, but there is nothing in the letter to suggest that Brindley told Petitioner this at the time of the plea offer. To the contrary, the wording of the letter suggests that this information was being conveyed to Petitioner for the first time after the trial. (*Id.* at 1 ("I have been analyzing the guidelines and I think we can make an argument for a sentence of 70-87 months or even less based on some new calculations I have done.").) The letter also does not make Petitioner any promises or guarantees. It merely states that Brindley was planning to "make an argument" for a sentence of 70-87 months.[6] (*Id.*) Petitioner seems to have understood that there were no guarantees, as he testified at the evidentiary hearing that "nothing's really guaranteed until you get in front of a judge." (R. 36, Evidentiary Hr'g Tr. at 41.) The other letter Petitioner points to was written in March 2009,

---

[6] Petitioner suggests that Brindley's decision to argue for such a light sentence proves that he was incompetent. (R. 38, Pet'r's Post-Hearing Br. at 13-14.) The Court disagrees and instead views Brindley's actions as evidence of zealous advocacy. Brindley filed a 45-page sentencing memorandum on Petitioner's behalf laying out various theories of accountability, including a theory under which the sentencing range would be 70-87 months. (*Delatorre*, No. 03 CR 90, R. 1694, Sentencing Mem.) The transcript from the sentencing hearing shows that Brindley was fully aware of the government's sentencing position; he nonetheless argued vigorously for a lighter sentence, trying to paint Petitioner in sympathetic terms as someone who had joined the gang at a very young age and later tried to distance himself from it. (*Delatorre*, No. 03 CR 90, R. 1776, Sentencing Tr.) Brindley requested a sentence of 70-87 months and no more than 120 months based on Petitioner's relative culpability within the gang. (*Id.* at 20-48.) It is clear from Judge Leinenweber's close questioning of Brindley and the prosecutor, as well as his comments in imposing the sentence, that he found merit to Brindley's arguments. In the end, these arguments were simply unavailing given the damaging evidence of Petitioner's involvement in the gang's violent activities. (*Id.* at 52-54.)

long after the trial was over, and is similarly equivocal. (R. 32, Joint Ex. 5, Letter of Mar. 12, 2009.) It states only that it was Brindley's "hope" that his arguments would result in a sentence for Petitioner in the range of 70-87 months. (*Id.*) Given the timing and wording of these letters, they provide little support for Petitioner's claim that Brindley told him unequivocally at the time of the plea offer that he was facing a likely sentence of 70-87 months and a maximum sentence of 10 years.[7]

Other evidence in the record suggests that Petitioner did in fact know he was facing a sentence much longer than 10 years if he was convicted. At the very outset of the case—during Petitioner's October 2005 detention hearing—one of the prosecutors stated in open court and in Petitioner's presence that Petitioner was facing 20 years on the racketeering charge. (R. 32, Joint Ex. 1, Detention Hearing Tr. at 36.) Although Petitioner admits that he was present at that hearing, he claims that he either did not hear this or did not realize what the prosecutor was saying. (R. 36, Evidentiary Hr'g Tr. at 35-36.) The Court finds this testimony unpersuasive. Although there were multiple defendants involved in this case, the transcript reflects that the detention hearing only involved Petitioner and two other defendants. (R. 32, Joint Ex. 1, Detention Hr'g Tr. at 1-3.) The attorneys addressed the situation of each defendant separately and in detail, with Petitioner being last. (*Id.* at 4-36.) During the discussion of Petitioner's bond, the prosecutor stated in very plain language that Petitioner was facing 20 years if convicted on the racketeering charge. (*Id.* at 36.)

Petitioner now suggests that he was "in shock" from his arrest, such that he was not paying close attention to what the prosecutor was saying. (R. 36, Evidentiary Hr'g Tr. at 36-37.)

---

[7] Petitioner has submitted an additional letter Brindley wrote to him in May 2010 regarding arguments he intended to raise on appeal, but this letter sheds no light on any discussions the two might have had years earlier in connection with the government's pretrial plea offer. (*See* R. 32, Joint Ex. 6, Letter of May 4, 2010.)

This testimony might carry more weight if the arrest and detention hearing had occurred on the same day, but in fact Petitioner's detention hearing occurred nearly two weeks after his arrest. (*See* R. 33, Stip. Facts ¶¶ 2, 4.) The Court finds it unbelievable that Petitioner was not paying close attention to every word that was said during this hearing, as he was well aware of the severity of the federal charges. (R. 36, Evidentiary Hr'g Tr. at 33-35.) He was also well aware of the significance of the bond hearing, which was to decide whether he would be staying in jail while the charges were pending. (*Id.* at 34-35.) Although he had never been charged with a federal crime, he was not new to the criminal justice system; at the time of the detention hearing he had incurred two prior felony convictions, a bond forfeiture, and a probation violation in state court. (R. 32, Joint Ex. 1, Detention Hr'g Tr. at 29.) In short, the Court does not believe that Petitioner somehow did not hear or understand the plain statement of the prosecutor that he was facing a potential sentence of 20 years.[8]

Additionally, if Petitioner did not know he was facing a possible 20-year sentence, it would have made no sense for him to have viewed the 15-year plea agreement as a "sweetheart deal" when it was offered to him. This is precisely what he attested to in the affidavit he submitted with his Petition. (*See* R. 4, Pet'r's Aff. ¶¶ 4-5 ("The Government presented me a plea offer of 180 months (15) years imprisonment . . . . I thought the plea offer was a 'sweetheart deal,' and was more than ready and willing to sign the plea agreement, and plead guilty thereto." ).) At the evidentiary hearing, he tried to back away from this statement, testifying that it was

---

[8] The Court also finds it notable that at sentencing, Brindley stated that Petitioner had been "sitting in jail for five years, and for a lot of that time, he sat there thinking about the possibility of a life sentence." (*Delatorre*, No. 03 CR 90, R. 1776, Sentencing Tr. at 43-44.) At no time did Petitioner correct this statement or otherwise complain about any aspect of Brindley's performance, even though he was given a chance to address the Court. (*See id.* at 50-51.) Instead, he expressed "regret" over "being a horrible person" and apologized to anyone "who was hurt by this needless violence." (*Id.* at 50.)

19

only *now* that he understood the plea offer to be a "sweetheart deal." (R. 36, Evidentiary Hr'g Tr. at 67.) But this is not what his affidavit states, and he swore to the truth and accuracy of this statement under penalty of perjury. Additionally, his testimony at the evidentiary hearing that he thought the plea was worthless when it was presented to him does not jibe with his other testimony that he did not reject the plea outright, and instead took it with him so that he could give it more consideration. (*See* R. 36, Evidentiary Hr'g Tr. at 23, 42.) It is unclear why Petitioner would have spent any time considering a worthless plea agreement that offered him more time than he thought he could possibly get if he went to trial. These discrepancies further undercut Petitioner's credibility.

Petitioner argues that because the evidence against him was so overwhelming, the fact that he chose to proceed to trial necessarily proves that some outside force (specifically, Brindley) "cause[d] him to stray from his initial instinct" to plead guilty. (R. 38, Pet'r's Post-Hr'g Br. at 19.) The Court does not find this argument convincing. The evidence shows that prior to trial, Petitioner was far more equivocal about pleading guilty than he now suggests. He admitted that for two years, he never asked any of the three attorneys who represented him about pleading guilty, nor did he ask Brindley about pleading guilty at their initial meeting even though he felt he could have done so. (R. 36, Evidentiary Hr'g Tr. at 62-63.) He stated that he felt "it was too early in the case . . . to even know anything about whether to plea or not." (*Id.* at 62.) This testimony runs counter to his argument that he had a steadfast desire to plead guilty from the very beginning of the case, which Brindley single-handedly derailed with his mistaken advice. Additionally, the Court finds it notable that all but one of the Insane Deuces opted to proceed to trial, notwithstanding the overwhelming evidence of their guilt. Whether this was due

to loyalty, fear of reprisal, bravado, ignorance, or some other reason may never be known, but Petitioner has not convinced the Court that *his* decision was attributable to an error by Brindley.

Based on the record, Petitioner's claim that Brindley erroneously advised him that he was facing a 10-year maximum sentence is simply not credible. At best, the Court attributes the discrepancy to faulty memory, and at worst, to gamesmanship aimed at gaining the benefit of a plea offer that Petitioner clearly rejected at the time it was made. In either event, the Court declines to credit Petitioner's testimony, and he has offered no other persuasive evidence to demonstrate that Brindley made a gross mischaracterization of the penalty he was facing if he proceeded to trial. Accordingly, he has failed to establish that Brindley's performance was deficient.

## II. Prejudice

Because Petitioner has failed to establish deficient performance, the Court need not reach the prejudice prong. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one.").) Even if the Court were to reach this prong, it would not weigh in Petitioner's favor. To establish prejudice, Petitioner must demonstrate a reasonable probability that he would have accepted the plea, and that the plea would have been accepted by the government and approved by the court. *Frye*, 132 S. Ct. at 1409. Petitioner has not made that showing.

First, he has not established a reasonable probability that he would have accepted the government's plea offer in the absence of an error by Brindley. As explained above, the evidence shows that Petitioner knew he was facing a lengthy sentence of potentially 20 years at the time of the government's plea offer. Notwithstanding this knowledge, Petitioner elected to reject the

offer. It appears that he may have been unhappy with the proposed plea agreement because it required him to plead guilty to two new offenses that were not charged in the original indictment, one of which itself carried a maximum sentence of life in prison. (R. 36, Evidentiary Hr'g Tr. at 22-23; R. 32, Joint Ex. 3, Draft Plea Agreement ¶ 7(a).) Other evidence suggests that he wanted a sentence below 15 years, which the government was not willing to offer. (R. 36, Evidentiary Hr'g Tr. at 90.) But whatever his reasoning at the time, he has failed to show that an error by Brindley was the "decisive factor" in his decision to reject the plea offer. *See Wyatt*, 574 F.3d at 458.

Second, although Petitioner insists that he was willing to proffer as part of a plea, the Court finds it extremely doubtful—given his shifting and conflicting testimony in this proceeding—that he would have provided a complete and truthful proffer that would have satisfied the government. [9] (*See* R. 36, Evidentiary Hr'g Tr. at 89-94, 105; R. 32, Joint Ex. 2, Letter of Nov. 14, 2007.) He has therefore failed to demonstrate a reasonable probability that the plea would have been approved by the government in the absence of an alleged error by Brindley. *See Frye*, 132 S. Ct. at 1409; *see also Thompson*, 732 F.3d at 830 (petitioner failed to establish prejudice in connection with his claim that counsel's erroneous advice caused him to reject a favorable plea, where he failed to demonstrate that he was willing to provide a truthful proffer at the time of trial). Petitioner has failed to make the requisite showing of prejudice. For these reasons, the Petition will be denied.

---

[9] To the extent there is a disagreement between the parties, the Court finds sufficient evidence of a tangible plea offer made by the government. Although the offer never reached the point of receiving formal approval from Pope's supervisors at the U.S. Attorney's Office, the Court credits Pope's testimony that, in his view, if Petitioner had accepted the plea and made a full proffer, "we would have gotten this deal done." (R. 36, Evidentiary Hr'g Tr. at 107.)

III.  **Certificate of Appealability**

As a final matter, the Court must decide whether to grant Petitioner a certificate of appealability. *See* RULE 11 OF THE RULES GOVERNING SECTION 2254 CASES. To obtain a certificate of appealability, Petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). For the reasons outlined above, the Court finds no basis to conclude that reasonable jurists would debate the outcome of the Petition or find a reason to encourage Petitioner to proceed further. Accordingly, the Court declines to issue him a certificate of appealability.

**CONCLUSION**

For the foregoing reasons, the Petition (R. 1) is DENIED. Petitioner is DENIED a certificate of appealability.

ENTERED: _____
**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: October 21, 2015**

23